In re OLSHAN FOUNDATION REPAIR
COMPANY, LLC and Olshan Founda-
tion Repair Company of Dallas, Ltd.,
Relators.

Nos. 09–0432, 09–0433, 09–0474, 09–0703.

Supreme Court of Texas.

Argued March 23, 2010.

Decided Dec. 3, 2010.

Stephan B. Rogers, Rogers & Moore, Boerne, Duncan Roderick MacRae II, Henslee Schwartz, LLP, Austin, Mark C. Roberts, Henslee Schwartz, LLP, Dallas, Jeffrey D. Janota, Henslee Schwartz,

LLP, Austin, for Olshan Foundation Repair Company, LLC.

Robert W. Loree, Edwin Todd Lipscomb, Loree, Hernandez & Lipscomb, PLLC, San Antonio, Steven W. Thornton, McCorkle Westerburg & Thornton, P.C., David M. Walsh IV, Chamblee & Ryan, P.C., Dallas, for Real Parties in Interest Kenneth Kilpatrick in No. 09–0432, Charley Tisdale in No. 09–0433, Craig Waggoner in No. 09–0474.

Robert W. Loree, Edwin Todd Lipscomb, Christopher Dean Below, Loree, Hernandez & Lipscomb, PLLC, San Antonio, Steven W. Thornton, McCorkle Westerburg & Thornton, P.C., David M. Walsh IV, Chamblee & Ryan, P.C., Dallas, for Real Party in Interest Robert Tingdale in No. 09–0703.

Justice WAINWRIGHT delivered the opinion of the Court.

Olshan Foundation Repair Company filed these petitions for writs of mandamus in four different cases in which three separate trial courts denied Olshan's pleas in abatement, refusing to compel arbitration of consumer claims against it. Three different courts of appeals also declined to order the disputes to arbitration. We consolidated these cases for argument and now issue a consolidated opinion. Because the Texas General Arbitration Act (TAA), and not the Federal Arbitration Act (FAA), governs the arbitration dispute in one of the cases (Waggoner, No. 09–0474), we deny Olshan mandamus relief in that case. We conclude that for the other three cases, the trial courts erred in holding that the TAA governs the arbitrations, there is no evidence that the arbitration agreements were unconscionable as a matter of law, and all other disputed issues are questions for the arbitrator. Because the trial court erred by denying Olshan's pleas in abatement in the arbitrations governed by the FAA, we conditionally grant mandamus relief in those three actions.

## I. Factual and Procedural Background

Olshan is a national company that repairs residential home foundations. In 1998, Craig and Joy Waggoner contracted with Olshan to repair their home's foundation. The Waggoners subsequently discovered new damage to the foundation and hired an engineer, Peter De la Mora, to investigate the problems. In a 2007 report, De la Mora concluded that Olshan had not properly repaired the home. The Waggoners filed suit against Olshan for breach of contract, breach of warranty, negligence, violations of the Texas Deceptive Trade Practices Act, and violations of the Texas Home Solicitation Act.

In three other cases, similar circumstances unfolded. In 2002, Olshan contracted with Vickie and Kenneth Kilpatrick, who filed suit against Olshan in 2007. The Kilpatricks' case was consolidated at the appellate court level with claims brought by Charley and Gladys Tisdale, again with nearly identical facts. In June 2007, Robert and Marta Tingdale, who initially contracted with Olshan in 2004, filed another similar case. All plaintiffs are represented by the same counsel, and each case includes a report from De la Mora opining that Olshan had not properly repaired each home.

The four repair contracts were in writing, and each contained arbitration clauses. The arbitration clauses in Kilpatrick (No. 09–0432), Tisdale (No. 09–0433), and Tingdale (No. 09–0703) provide:

> Notwithstanding, any provision in this agreement to the contrary, any dispute, controversy, or lawsuit between any of the parties to this agreement about any matter arising out of this agreement, shall be resolved by mandatory and

binding arbitration administered by the American Arbitration Association ("AAA") **pursuant to the arbitration laws in your state** and in accordance with this arbitration agreement and the commercial arbitration rules of the AAA....

(emphasis added). The arbitration clause in the Waggoner (No. 09–0474) agreement is identical except for the language in bold, which states **"pursuant to the Texas General Arbitration Act."** (emphasis added). None of the agreements addressed in this opinion was signed by the consumers' attorney or exceeded $50,000 in consideration.

Olshan filed a plea in abatement in each case and sought to compel arbitration under the Federal Arbitration Act (FAA). The homeowners responded to the pleas, arguing that: (1) the TAA applies to the agreements to the exclusion of the FAA, rendering the arbitration agreements unenforceable because the agreements were not signed by the homeowners' attorney; and (2) arbitration with the AAA is substantively unconscionable because of the expense required and because the contract itself was undisputably unenforceable under the Texas Home Solicitation Act.

The trial court denied Olshan's plea in the Waggoners' action. It held that the TAA applies to the agreement, and thus the arbitration agreement was unenforcea-ble pursuant to Chapter 171 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem.Code § 171.002(a)(2) (requiring arbitration agreements in service contracts for less than $50,000 be signed by all parties and their attorneys). The trial court alternatively held that the prohibitive cost of arbitration rendered the agreement to arbitrate unconscionable. Olshan petitioned for mandamus relief with the court of appeals, which was denied. The court of appeals held the TAA was not preempted by the FAA, and section 171.002(a)(2) of the TAA rendered the agreement unenforceable. It denied Olshan's writ of mandamus without reaching the other issues. In the remaining three actions, the trial courts denied Olshan's pleas in abatement and the courts of appeals denied Olshan's petitions for writs of mandamus.[1]

## II. Standard for Mandamus

At the time these petitions were filed, there was no method under Texas procedure for parties to file interlocutory appeals of a trial court's refusal to compel arbitration under the FAA.[2] Olshan sought relief through petitions for writs of mandamus. *See Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 272 (Tex.1992). Mandamus will not issue unless: (1) the trial judge has committed a clear abuse of discretion; and (2) there is no adequate remedy on appeal. *In re Odyssey Health-*

---

1. The Tingdale, Kilpatrick and Tisdale trial courts issued memorandum opinions, which are addressed by the courts of appeals, respectively, in No. 10–09–00119–CV, 2009 WL 1886648 (Tex.App.-Waco July 1, 2009, orig. proceeding); Nos. 2–08–336–CV, 2–08–342–CV, 2008 WL 4661815 (Tex.App.-Fort Worth Oct. 2, 2008, orig. proceeding).

2. The Legislature recently amended the Texas Civil Practice and Remedies Code to allow an interlocutory appeal "to the court of appeals from the judgment or interlocutory order of a district court ... under the same circum-stance that an appeal from a federal district court's order or decision would be permitted by 9 U.S.C. Section 16." Tex. Civ. Prac. & Rem Code § 51.016. However, this act is not applicable to appeals of an interlocutory order in an action pending as of September 1, 2009. Act of June 19, 2009, 81st Leg., R.S., ch. 820, § 2, 2009 Tex. Gen. Laws 2061. Because all four actions in this consolidated opinion were pending as of September 1, 2009, section 51.016 does not allow an interlocutory appeal of these causes.

*care, Inc.,* 310 S.W.3d 419, 422 (Tex.2010) (per curiam) (citing *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135–36 (Tex. 2004)). A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable it amounts to a clear and prejudicial error of law or it clearly fails to correctly analyze or apply the law. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex. 1992) (citations omitted). The second requirement for mandamus relief, that the relator has no adequate remedy by appeal, "has no comprehensive definition." *See In re Ford Motor Co.,* 165 S.W.3d 315, 317 (Tex.2005) (citing *Prudential,* 148 S.W.3d at 136). However, we have determined that relators have no adequate remedy by appeal when a trial judge erroneously refuses to compel arbitration under the FAA. *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 753 (Tex.2001).

This Court must decide whether the trial courts abused their discretion by not compelling arbitration pursuant to the FAA, as requested in Olshan's pleas in abatement. The trial courts abuse their discretion by refusing to compel arbitration if the FAA preempts the TAA and the arbitration agreements are not unconscionable. However, the trial courts did not err by denying Olshan's pleas in abatement if the TAA applies to the agreements or the agreements are unconscionable.

### III. Federal Preemption

#### A. *The FAA and Choice of Law*

The TAA renders arbitration agreements unenforceable if the agreements containing the arbitration clauses are agreements for services "in which the total consideration to be furnished by the individual is not more than $50,000" and the agreements are not in writing, signed by each party, and each party's attorney. TEX. CIV. PRAC. & REM.CODE § 171.002(a)(2). The homeowners contend that the arbitra-

tion agreements are governed by the TAA and are unenforceable for failure to meet the two identified TAA requirements. Olshan argues that the FAA applies to the agreements and preempts the TAA's exemption from coverage under section 171.002(a)(2), making the arbitration clauses enforceable. *See In re Nexion Health at Humble, Inc.,* 173 S.W.3d 67, 69 (Tex. 2005) (per curiam) (addressing a similar exemption under the TAA for personal injury cases).

Section 2 of the FAA preempts state law that would otherwise render arbitration agreements unenforceable in a contract involving interstate commerce. 9 U.S.C. § 2; *Southland Corp. v. Keating,* 465 U.S. 1, 10–11, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). "The Act was designed to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate, and place such agreements upon the same footing as other contracts." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.,* 489 U.S. 468, 474, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) (internal quotations omitted). We have recognized that the FAA preempts parts of the TAA, including section 171.002(a)(2) of the Civil Practice and Remedies Code. *See Jack B. Anglin Co.,* 842 S.W.2d at 271 (discussing FAA's preemption of non-waiver provision of DTPA); *Nexion,* 173 S.W.3d at 69 (Tex. 2005) (discussing FAA's preemption of TAA section 171.002(a)(3)).

But the FAA does not "confer a right to compel arbitration of any dispute at any time." *Volt,* 489 U.S. at 474, 109 S.Ct. 1248. The FAA policy is simply to "ensur[e] that private agreements to arbitrate are enforced according to their terms." *Id.* at 479, 109 S.Ct. 1248. In *Volt,* the Court upheld the application of a California statute that allowed a stay of arbitration proceedings pending resolution of related litigation because the contract

also contained a choice-of-law clause providing that "[t]he Contract shall be governed by the law of the place where the Project is located." *Id.* at 470, 109 S.Ct. 1248. The Court reiterated that "the FAA pre-empts state laws which 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.'" *Id.* at 478, 109 S.Ct. 1248 (quoting *Southland Corp.*, 465 U.S. at 10, 104 S.Ct. 852). But the FAA does not prevent

> the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself.... Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted.... By permitting the courts to "rigorously enforce" such agreements according to their terms, we give effect to the contractual rights and expectations of the parties, without doing violence to the policies behind by the FAA.

*Id.* at 479, 104 S.Ct. 852 (citations omitted).

Subsequently, in *Mastrobuono v. Shearson Lehman Hutton, Inc.*, the Court held that the FAA preempted New York's prohibition against arbitral awards of punitive damages despite a choice of law provision in an arbitration agreement that stated the agreement "shall be governed by the laws of the State of New York." 514 U.S. 52, 63–64, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). The Court first stressed that the agreement would be enforced as written, stating that "the case before us comes down to what the contract has to say about the arbitrability of petitioners' claim for punitive damages." *Id.* at 58, 115 S.Ct. 1212. Where the Court in *Volt* read the

choice-of-law provision as definitively choosing state law over federal law, the Court in *Mastrobuono* read the provision differently:

> The choice-of-law provision, when viewed in isolation, may reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes arising out of the contractual relationship.
>
> . . .
>
> At most, [it] introduces an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards.

*Id.* at 59, 62, 115 S.Ct. 1212. Then, using FAA mandated rules of contract construction, the Court concluded that the provision should be read "to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators." *Id.* at 62–64, 115 S.Ct. 1212.

Thus, courts treat arbitration agreements as other contracts in applying the legal rules to interpret them. The goal is to discern the true intentions of the parties, as the FAA's primary purpose is to ensure private agreements to arbitrate are enforced according to their terms, no more, no less. *Volt*, 489 U.S. at 479, 109 S.Ct. 1248; *see also Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 709 (7th Cir.1994) (Posner, C.J.) ("[S]hort of authorizing trial by battle or ordeal or, more doubtfully, by a panel of three monkeys, ... parties are as free to specify idiosyncratic terms of arbitration as they are to specify any other terms in their contract.").

### B. This Court's Treatment of Choice-of-Law Provisions Relating to Arbitration Agreements

This Court analyzed contractual language in the context of the relationship

between an arbitration clause and a general choice-of-law provision in *In re L & L Kempwood Associates, L.P.*, 9 S.W.3d 125, 127–28 (Tex.1999) (per curiam). We held that an agreement containing a general choice-of-law provision stating that the entire contract will be governed by "the law of the place where the Project is located," does not preclude application of the FAA. *Id.* The Court observed that the Project was located in Houston, thus the FAA was part of "the law of the place where the Project is located." *Id.*; *see also Capital Income Props. v. Blackmon*, 843 S.W.2d 22, 23 (Tex.1992) (per curiam) (stating that "[t]he Federal [Arbitration] Act is part of the substantive law of Texas"). When the language of the provision included federal law, further language specifically excluding application of the FAA is necessary for a court to apply the TAA to the FAA's exclusion. "The choice-of-law provision did not specifically exclude the application of federal law, and absent such an exclusion we decline to read the choice-of-law clause as having such an effect." *L & L Kempwood*, 9 S.W.3d at 127–28. Rather, a general choice-of-law provision "may reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes." *Id.* at 127 n. 16 (citing *Mastrobuono*, 514 U.S. at 59–60, 115 S.Ct. 1212). Courts apply the FAA unless language in the arbitration agreement indicates its exclusion.

### C. The Law the Parties Chose

■ Three of the arbitration agreements state that disputes arising out of the contract "shall be resolved by mandatory and binding arbitration administered ... pursuant to the arbitration laws in your state. . . ." Courts rarely read such general choice-of-law provisions to choose state law to the exclusion of federal law. *See Mastrobuono*, 514 U.S. at 59, 115 S.Ct.

1212; *L & L Kempwood*, 9 S.W.3d at 127 n. 16. Further, just as the FAA is part of the substantive law of Texas, the FAA would be part of the arbitration laws in Texas. *See L & L Kempwood*, 9 S.W.3d at 127 n. 15 (quoting *Capital Income Props.*, 843 S.W.2d at 23). The language of the arbitration clause designating arbitration pursuant to "the arbitrations laws in your state" includes the FAA. *See id.* at 127–28. Thus, the FAA applies to the three agreements that include the "arbitration laws in your state" language, and the FAA preempts the provisions of section 171.002(a)(2) of the TAA that would otherwise render the agreements unenforceable. The trial courts abused their discretion in denying Olshan's requests to compel arbitration based on the unenforceability of the arbitration under section 171.002(a)(2) in the Kilpatrick, Tisdale and Tingdale cases.

■ In contrast, the Waggoner agreement states that disputes arising out of the contract "shall be resolved by mandatory and binding arbitration ... pursuant to the Texas General Arbitration Act. . . ." This provision distinguishes the Waggoner agreement from the other agreements and the agreements in *L & L Kempwood* and *Mastrobuono.* This is not the same general choice-of-law provision. This provision chooses a state's substantive law, specifically the TAA, to govern disputes under the agreement. A valid choice-of-law provision makes a conflicts-of-law analysis unnecessary; this provision expresses a preference between federal and state law. *Id.* The FAA is part of the arbitration laws of Texas and can be applied to arbitration administered pursuant to the laws of Texas. However, the FAA is not part of the TAA, at least to the extent the two are inconsistent.

The Fifth Circuit has likewise interpreted an arbitration clause specifically invoking the TAA as designating the TAA to govern all aspects of arbitration under the agreement, to the exclusion of the FAA. *Ford v. NYLCare Health Plans of the Gulf Coast, Inc.*, 141 F.3d 243, 246 (5th Cir. 1998) (applying Texas law). The court stated the parties may "specify the law governing interpretation of the scope of the arbitration clause." *Id.* at 248. The focus of the determination is on the parties' choice. Thus, the court held that the parties intended the TAA to govern the scope of the arbitration clause. *Id.* at 249.

The language of the Waggoner agreement also indicates the parties' intention that the TAA govern the scope of their arbitration agreement. The plain language clearly indicates that the parties intend their arbitration to be governed by the TAA rather than merely "the law of the state" or "Texas law." The parties' intention that arbitration be administered pursuant to the TAA would be thwarted if the FAA preempted the TAA's specific provisions. Thus, an agreement specifying that arbitration occur "pursuant to the Texas General Arbitration Act" excludes the FAA's preemption of section 171.002(a)(2) of the TAA.[3]

Because the TAA would render the Waggoners' arbitration agreement unenforceable, and because the FAA was not chosen by the parties, the trial court correctly denied Olshan's plea in abatement, seeking to compel arbitration of Waggoner's action against Olshan. However, because the parties in the Kilpatrick, Tisdale, and Tingdale contracts chose to arbitrate pursuant to the laws of Texas, which include the FAA, the FAA preempts section 171.002(a)(2) of the TAA and precludes those requirements from barring arbitration.

## IV. Unconscionability

Even though the FAA governs the arbitration agreements in the Kilpatrick, Tisdale, and Tingdale contracts, if those agreements are unconscionable, they are unenforceable. The homeowners contend that the arbitration agreements are unconscionable because "mandatory binding arbitration administered by the American Arbitration Association ... in accordance with this arbitration agreement and the commercial arbitration rules of the AAA" is prohibitively expensive, preventing their ability to vindicate their claims. Further, they contend the contracts are clearly void because Olshan violated the Home Solicitation Act, exacerbating the unconscionability of the agreement.

### A. Unconscionability of Arbitration Agreements

Section 2 of the FAA states arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. A central purpose of the FAA is "to reverse the longstanding judicial hostility to arbitration agreements ... and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (citations omitted). Such agreements are enforceable only if they meet "the requirements of the general contract law of the applicable state." *In re Poly–America, L.P.*, 262 S.W.3d 337, 347 (Tex.2008) (citation omitted). When determining whether an agreement to arbitrate is valid, "state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the va-

3. We do not believe the choice-of-law provi- sion to be ambiguous.

lidity, revocability, and enforceability of contracts generally." *Perry v. Thomas,* 482 U.S. 483, 493 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987).

Texas law renders unconscionable contracts unenforceable. *Poly–America,* 262 S.W.3d at 348. Texas further recognizes both substantive and procedural unconscionability. "Substantive unconscionability refers to the fairness of the arbitration provision itself, whereas procedural unconscionability refers to the circumstances surrounding adoption of the arbitration provision." *In re Palm Harbor Homes, Inc.,* 195 S.W.3d 672, 677 (Tex. 2006). Because the homeowners complain of the prohibitive cost of arbitration, their claim is grounded in substantive unconscionability. Generally, a contract is unconscionable if, "given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *FirstMerit Bank,* 52 S.W.3d at 757 (citing Tex. Bus. & Com.Code § 2.302 cmt. 1). "The principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power." Tex. Bus. & Com.Code § 2.302 cmt. 1 (internal citation omitted).

The U.S. Supreme Court has held that statutory claims may be arbitrated "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum." *Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) (citing *Gilmer,* 500 U.S. at 28, 111 S.Ct. 1647). Conversely, an arbitration agreement may render a contract unconscionable if "the existence of large arbitration costs could preclude a litigant … from effectively vindicating [his or her] federal statutory rights in the arbitral forum." *Id.; see also Poly–America,* 262 S.W.3d at 355–57; *FirstMerit Bank,* 52 S.W.3d at 756 (citing *Green Tree,* 531 U.S. at 91, 121 S.Ct. 513).

We should be wary of setting the bar for holding arbitration clauses unconscionable too low. First, arbitration is favored in both federal and Texas law, and to conclude that an arbitration agreement is unconscionable based merely on the "'risk' that [the claimant] will be saddled with prohibitive costs" would undermine the "'liberal federal policy favoring arbitration agreements.'" *Green Tree,* 531 U.S. at 91, 121 S.Ct. 513 (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)); *FirstMerit Bank,* 52 S.W.3d at 756. Second, the theory behind unconscionability in contract law is that courts should not enforce a transaction so one-sided, with so gross a disparity in the values exchanged, that no rational contracting party would have entered the contract. Restatement (Second) of Contracts § 208 cmt. b (1981). But as we have recognized previously,

> there is nothing *per se* unconscionable about arbitration agreements. In fact, historically, Texas law favors settling disputes by arbitration. Arbitration agreements, like the one here, offer a permissible choice to traditional litigation that does not favor either party. Moreover, assuming unequal bargaining power between [the parties] exists does not establish grounds for defeating an agreement to arbitrate under the FAA.

*EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 90–91 (Tex.1996) (per curiam) (citations omitted). Furthermore, arbitration clauses in consumer contracts reduce merchants' operating costs and produce savings passed on to the consumer in the form of lower prices. Thus, a fairly adminis-

tered arbitration should not create a gross disparity in the values exchanged. Stephen J. Ware, *Paying the Price of Process: Judicial Regulation of Consumer Arbitration Agreements*, 2001 J. DISP. RESOL. 89, 89 (2001); *see generally* Steven Shavell, *Alternative Dispute Resolution: An Economic Analysis*, 24 J. LEGAL STUD. 1 (1995). However, we also recognize that arbitration is intended as a lower cost, efficient alternative to litigation. *See Poly–America*, 262 S.W.3d at 347 ("[A]rbitration is intended to provide a lower-cost, expedited means to resolve disputes...."). Where these justifications are vanquished by excessive arbitration costs that deter individuals from bringing valid claims, the unconscionability doctrine may protect unfairly disadvantaged consumers. We agree, as in *Green Tree*, that excessive costs imposed by an arbitration agreement render a contract unconscionable if the costs prevent a litigant from effectively vindicating his or her rights in the arbitral forum. *See Green Tree*, 531 U.S. at 90, 121 S.Ct. 513.

### B. Application of the Standard

The party opposing arbitration bears the burden to show that the costs of arbitration render it unconscionable. When "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Green Tree*, 531 U.S. at 92, 121 S.Ct. 513. This Court likewise requires "*some evidence* that a complaining party will likely incur arbitration costs in such an amount as to deter

enforcement of statutory rights in the arbitral forum." *Poly–America*, 262 S.W.3d at 356; *accord In re U.S. Home Corp.*, 236 S.W.3d 761, 764 (Tex.2007); *FirstMerit Bank*, 52 S.W.3d at 756–57.

■ The Court in *Green Tree* did not explain how detailed the showing of prohibitive expense need be to invalidate an arbitration agreement. *Green Tree*, 531 U.S. at 92, 121 S.Ct. 513 ("How detailed the showing of prohibitive expense must be before the party seeking arbitration must come forward with contrary evidence is a matter we need not discuss...."). However, a number of federal courts of appeals, relying on *Green Tree*, have applied a case-by-case analysis of the effect the arbitration clause has on the particular plaintiff's ability to effectively vindicate his rights.[4] The Fourth Circuit's approach in *Bradford v. Rockwell Semiconductor Systems, Inc.* is particularly instructive. 238 F.3d 549 (4th Cir.2001). The court noted the proper analysis "evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation." *Id.* According to the court, that inquiry requires "a case-by-case analysis that focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims." *Id.* (quotations omitted). The key factor is not *where* the cost to pursue the claim goes, but *what* the total cost to the claimant to pursue the claim is. The

---

4. *See Musnick v. King Motor Co. of Fort Lauderdale*, 325 F.3d 1255, 1259 (11th Cir.2003) ("Since *Green Tree*, all but one of the other Circuits that have reconsidered this issue have applied a similar case-by-case approach."); *see also Blair v. Scott Specialty Gases*, 283 F.3d 595, 609–10 (3d Cir.2002); *Bradford v. Rockwell Semiconductor Sys., Inc.*,

238 F.3d 549, 556 (4th Cir.2001); *LaPrade v. Kidder, Peabody & Co., Inc.*, 246 F.3d 702, 708 (D.C.Cir.2001). *But see Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 895 (9th Cir. 2002) (holding that plaintiff employees should not "have to pay either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum").

court "fail[ed] to see how a claimant could be deterred from pursuing his statutory rights in arbitration simply by the fact that his fees would be paid to the arbitrator where the overall cost of arbitration is otherwise equal to or less than the cost of litigation in court." *Id.*

Likewise, in *Honrubia Properties, Ltd. v. Gilliland,* the Corpus Christi–Edinburg Court of Appeals essentially accepted *Bradford's* conceptual framework. Nos. 13–07–210–CV, 13–07–249–CV, 2007 WL 2949567 at *6 (Tex.App.-Corpus Christi-Edinburg Oct. 11 2007, no pet.) (mem.op.). It considered the party's ability to pay the arbitration fee, the actual amount of the fee in relation to the amount of the underlying claim, and the cost differential between arbitration and litigation in court. *Id.* (citations omitted). Applying the standard, the court held the arbitration agreement was not substantively unconscionable where evidence showed the arbitration would cost approximately $15,000 to $20,283, plus expenses and other possible fees; the claimant was seeking more than $4,000,000 in compensatory and punitive damages; and arbitration costs would range from 11 percent to 15 percent of the claimant's gross income. *Id.* at *7. The claimant failed to submit any evidence pertaining to the expected cost differential between arbitration and litigation. *Id.*

In applying the unconscionability standard, the crucial inquiry is whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, a forum where the litigant can effectively vindicate his or her rights. With this in mind, we agree that the approach taken by the Fourth Circuit in *Bradford* effectively pursues this inquiry. We note all of the analyses previously discussed correctly assume that litigation allows claimants to effectively vindicate their rights, despite the expense. The desire to avoid steep litigation expense—including the costs of longer proceedings, more complicated appeals on the merits, discovery, investigations, fees, and expert witnesses—is the purpose of arbitration in the first place. *See Jack B. Anglin Co.,* 842 S.W.2d at 272–73 ("[T]he purpose of [arbitration is] providing a rapid, inexpensive alternative to traditional litigation...."). In the absence of unusual animus between the parties or external motives, plaintiffs continue to pursue claims when the expected benefits of the lawsuit outweigh the total cost of bringing it. If the total cost of arbitration is comparable to the total cost of litigation, the arbitral forum is equally accessible.[5] Thus, a comparison of the total costs of the two forums is the most important factor in determining

---

5. "Total cost" refers to the total cost of pursuing a claim in either forum, notwithstanding who will be financing the claim. Some courts have noted the argument that attorneys will be unwilling to represent plaintiffs on a contingency fee basis in the arbitral forum and that contingent fee arrangements make litigation less expensive for plaintiffs than arbitration. *See Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646, 664 (6th Cir.2003); *Poly-America,* 262 S.W.3d at 355. But other commentators argue that there is no reason why plaintiffs cannot secure the same financing when arbitration is mandated if both the value of their claim and the cost to pursue it remain constant. *See* Christopher R. Draho-

zal, *Arbitration Costs and Contingent Fee Contracts,* 59 Vand. L.Rev. 729, 768 (2006) ("On the face of it, there is no reason to expect contingent fee contracts to treat arbitration costs differently than they treat other litigation expenses."). We recognize arbitration is not always a lower-cost, efficient litigation alternative. Forcing consumer plaintiffs into an arbitral forum may affect their ability to pursue remedies when small claims are at issue. However, this does not excuse parties opposing arbitration from providing sufficient evidence to demonstrate that excessive costs make arbitration unconscionable in their particular case.

whether the arbitral forum is an adequate and accessible substitute to litigation. Other factors include the actual cost of arbitration compared to the total amount of damages the claimant is seeking and the claimant's overall ability to pay the arbitration fees and costs. These factors may also show arbitration to be an inadequate and inaccessible forum for the particular claimants to vindicate their rights. However, these considerations are less relevant if litigation costs more than arbitration.

### C.  Sufficiency of the Evidence

■ *Green Tree* creates a burden-shifting test in which the "party seek[ing] to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive ... bears the burden of showing the likelihood of incurring such costs." *Green Tree*, 531 U.S. at 92, 121 S.Ct. 513. Once met, the burden shifts to "the party seeking arbitration [who] must come forward with contrary evidence." *Id.*; *see also Poly–America*, 262 S.W.3d at 348 ("The burden of proving such a ground—such as fraud, unconscionability or voidness under public policy—falls on the party opposing the contract."); *First-Merit Bank*, 52 S.W.3d at 756 ("Again, since the law favors arbitration, the burden of proving a defense to arbitration is on the party opposing arbitration.").

■ Evidence of the "risk" of possible costs of arbitration is insufficient evidence of the prohibitive cost of the arbitration forum. *Green Tree*, 531 U.S. at 91, 121 S.Ct. 513 ("The 'risk' that [the plaintiff] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement."). Rather, "both the United States Supreme Court and this Court require specific evidence that a party will actually be charged excessive arbitration fees." *U.S. Home Corp.*, 236 S.W.3d at 764; *see also FirstMerit Bank*,

52 S.W.3d at 757 ("Because the record contains no specific evidence that the [plaintiffs] will actually be charged excessive arbitration fees, we conclude that there is legally insufficient evidence that the plaintiffs would be denied access to arbitration based on excessive costs."). The party opposing arbitration must show the likelihood of incurring such costs in her particular case.

■ Thus, for evidence to be sufficient, it must show that the plaintiffs are likely to be charged excessive arbitration fees. While we do not mandate that claimants actually incur the cost of arbitration before they can show its excessiveness, parties must at least provide evidence of the likely cost of their particular arbitration, through invoices, expert testimony, reliable cost estimates, or other comparable evidence. *See Poly–America*, 262 S.W.3d at 354–55 (concluding that the plaintiff's "own affidavit and that of an expert witness providing detailed estimates of the likely cost of arbitration in [the plaintiff's] case" constituted sufficient evidence); *Olshan Found. Repair Co. v. Ayala*, 180 S.W.3d 212, 215–16 (Tex.App.-San Antonio 2005, pet. denied) (holding invoice for party's share of arbitration expenses sufficient). Evidence that merely speculates about the risk of possible cost is insufficient.

### D.  Application to the Facts

■ In applying this analysis to the facts at hand, we begin with the agreement itself, which states, "any matter arising out of this agreement shall be resolved by mandatory and binding arbitration administered by the American Arbitration Association ... in accordance with this arbitration agreement and the commercial arbitration rules of the AAA." According to the commercial arbitration rules, the AAA:

applies the *Supplementary Procedures for Consumer–Related Disputes* to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are nonnegotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. AAA Commercial Arbitration Rule R–1 (2007, 2009). The *Supplementary Procedures for ˙Consumer–Related Disputes* have a separate fee schedule for consumer arbitration:

### Administrative Fees

Administrative fees are based on the size of the claim and counterclaim in a dispute. They are based only on the actual damages and not on any additional damages, such as attorneys' fees or punitive damages. Portions of these fees are refundable pursuant to the Commercial Fee Schedule.

### Arbitrator Fees

For cases in which no claim exceeds $75,000, arbitrators are paid based on the type of proceeding that is used. The parties make deposits as set forth below. Any unused deposits are returned at the end of the case.

Desk Arbitration or Telephone Hearing $250 for service on the case

In Person Hearing $750 per day of hearing

For cases in which a claim or counterclaim exceeds $75,000, arbitrators are compensated at the rates set forth on their panel biographies.

### Fees and Deposits to be Paid by the Consumer:

If the consumer's claim or counterclaim does not exceed $10,000, then the consumer is responsible for one-half the arbitrator's fees up to a maximum of $125. This deposit is used to pay the arbitrator. It is refunded if not used.

If the consumer's claim or counterclaim is greater than $10,000, but does not exceed $75,000, then the consumer is responsible for one-half the arbitrator's fees up to a maximum of $375. This deposit is used to pay the arbitrator. It is refunded if not used.

If the consumer's claim or counterclaim exceeds $75,000, or if the consumer's claim or counterclaim is non-monetary, then the consumer must pay an Administrative Fee in accordance with the Commercial Fee Schedule.[6] A portion of this fee is refundable pursuant to the Commercial Fee Schedule. The consumer must also deposit one-half of the arbitrator's compensation. This deposit is used to pay the arbitrator. This deposit is refunded if not used. The arbitrator's compensation rate is set forth on the panel biography provided to the parties when the arbitrator is appointed.

AAA *Supplementary Procedures for Consumer–Related Disputes,* Administrative Fees, Arbitrator Fees, Fees and Deposits to be Paid by the Consumer (2005, 2010). Thus, for a consumer claim up to $75,000, the most a consumer will have to pay under these rules is $375 for the arbitra-

---

**6.** "The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees." AAA Commercial Arbitration Rule R– 49 (2007, 2009). In 2008, when Olshan sought to compel arbitration, the total initial filing fee and case service fee ranges from $2,550 for claims between $75,000–$150,000 to $8,500 for claims above $500,000. AAA Commercial Arbitration Administrative Fees, Fees (2007).

tor. *Id.*; *see also Green Tree*, 531 U.S. at 95, 121 S.Ct. 513 (Ginsburg, J., dissenting) (describing the AAA's Consumer Arbitration Rules as a model "for fair cost and fee allocation").

The homeowners bear the burden to show the likelihood of incurring excessive costs, yet no homeowners provided any concrete idea of the amount of their claims. It is impossible to know how much they will be charged under the AAA rules, even if the fees charged by AAA were excessive. Instead, the homeowners provided two invoices from the AAA for arbitration in, as the homeowners allege, "similar cases" to show the likelihood of excessive litigation costs. The first was a copy of the invoice from the AAA to the Ayalas who were plaintiffs in a different lawsuit against Olshan. It shows that the Ayalas' claim against Olshan was for $200,000, and that the Ayalas' were charged $35,900 to arbitrate that claim. The second was an invoice from the AAA to an anonymous claimant for the arbitration of a construction dispute, a similar type of case using only one arbitrator.[7] The amount of this claim is not stated on this invoice, but based on the administrative fee and case service fee charged by the AAA, we can deduce that it was between $75,000 and $150,000. The anonymous claimants were charged $11,406 to arbitrate.

Merely showing that other claimants have incurred arbitration costs of some amount falls well short of specific evidence that these particular parties will be charged excessive fees. There is no evidence that the homeowners' claims are similar in amount or difficulty as the claims of the Ayalas or the anonymous claimant. In fact, the Ayalas' invoice shows that their claim was for $200,000, while none of the homeowners' claims in this case exceeded $20,000. Moreover, there is no evidence that the homeowners have made any effort to reduce the likely charges through requests for fee waivers, pro bono arbitrators, or even simply requesting a one arbitrator panel. As the court in *In re MHI Partnership, Ltd.* aptly noted, "Substantive unconscionability threatens to become the exception that swallows the rule if all that must be done to avoid arbitration is to assume the most expensive possible scenario." No. 14–07–00851–CV, 2008 WL 2262157 at *7 (Tex. App.-Houston [14th Dist.] May 29, 2008, no pet.) (mem.op.).

Even if we took these invoices as evidence of the likely arbitration charges to the homeowners, they have provided no comparison of these charges to the expected cost of litigation, the amount of their claim, or their ability to pay these costs. *See Green Tree*, 531 U.S. at 90 n. 6, 121 S.Ct. 513 (concluding that a party's unsupported statement that she did not have the resources to pay the high costs of arbitration was insufficient); *Bradford*, 238 F.3d at 556 n. 5 ("The cost of arbitration, as far as its deterrent effect, cannot be measured in a vacuum or premised upon a claimant's abstract contention that arbitration costs are 'too high.' "). The record contains no specific evidence that the homeowners will actually be charged excessive arbitration fees, and thus there is no legally sufficient evidence that such fees prevent the homeowners from effectively pursuing their claim in the arbitral forum.

### E. Unconscionability in Light of the Texas Home Solicitation Act

■ Finally, the homeowners argue that the arbitration is unconscionable because the parties will expend time, energy,

---

7. It is unclear whether this means that the Ayalas requested three arbitrators. That the cost of the arbitrator to the Ayalas per day of hearing was $3,350, compared to $1,250 per day in the anonymous case, leads us to believe they did.

and money needlessly going to arbitration when the arbitrator will find the contract—including the arbitration clause—void, sending the case back to court.[8] They assert that their contract with Olshan violated the Texas Home Solicitation Act (THSA), which would render the agreements, including the arbitration clauses, void. The alleged basis for violation of the THSA is Olshan's failure to include in the agreements certain language regarding cancellation in at least 10–point boldfaced type, where the transactions occurred by personal solicitation outside Olshan's place of business. TEX. BUS. & COM. CODE §§ 601.002(a), .052, .053, .201. Further, the homeowners contend that there is no dispute over whether the contract violates the THSA, and the arbitrator will thus certainly find the contract void.[9]

It is tempting to avoid the unnecessary costs that would accompany an allegedly unnecessary arbitration. But to do so requires the trial court to make a determination of issues relating to the contract generally, even if it seems clear that one party or the other will prevail. As the U.S. Supreme Court stated in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, when the parties have contracted for arbitration of their disputes, a trial court "may consider only issues relating to the making and performance of the agreement to arbitrate." 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *see also Rent–A–Ctr., W., Inc. v. Jackson,* —— U.S. ——, 130 S.Ct. 2772, 2778, 177 L.Ed.2d 403 (2010); *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 445–46, 126 S.Ct.

1204, 163 L.Ed.2d 1038 (2006) ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."). There is no way to fashion a standard to determine whether arbitration is unnecessary without giving the trial court some discretion over issues relating to the making and performance of the contract generally—exactly what *Prima Paint,* and later *Buckeye* and *Rent–A–Center,* sought to avoid. Allowing courts to make this determination under an unconscionability analysis would provide an end run around the rule. While in some cases this "rule permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be void[,] ... it is equally true that [the opposite] approach permits a court to deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable." *Buckeye,* 546 U.S. at 448–49, 126 S.Ct. 1204. This conundrum is solved with a rule that allocates such decisions to arbitration, which is consistent with the liberal policy favoring arbitration in the FAA, U.S. Supreme Court decisions, and decisions of this Court. The homeowners failed to provide legally sufficient evidence of the prohibitive cost of arbitration to prove unconscionability, and this failure cannot be remedied by allowing the trial court to determine if it believes the contract itself is void.

## V. Conclusion

This Court endeavors to interpret agreements, including those to arbitrate, as they

---

8. The homeowners concede that the arbitrator and not a court decides a contractual defense to the contract as a whole as opposed to a contractual defense to just the arbitration provision. *See Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 445–46, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006); *In re Labatt Food Serv., L.P.,* 279 S.W.3d 640, 647–49 (Tex.2009).

9. Olshan states in its brief and stated at argument to the contrary that it will present certain defenses to this claim. It is neither our province nor the province of the trial court to determine the merits of these defenses when the parties have contracted to arbitrate such disputes.

are written. When an agreement specifically states that it is to be governed by the Texas General Arbitration Act, we hold that it will be governed by the Act, which may mean that disputes arising from its terms will be excluded from arbitration. Thus, the TAA applies to the arbitration agreement between the Waggoners (No. 09–0474) and Olshan and renders it unenforceable. *See* TEX. CIV. PRAC. & REM.CODE § 171.002(a)(2). The trial court did not err by denying Olshan's plea in abatement, and the court of appeals denied relief. We also deny mandamus relief in the Waggoner case.

However, where an arbitration agreement states that it is to be governed by the law of this state, that law includes the Federal Arbitration Act. Because it is proper to apply the FAA to the Kilpatrick (No. 09–0432), Tisdale (No. 09–0433), and Tingdale (No. 09–0703) agreements that use such language, the FAA preempts the provisions of section 171.002(a)(2) that would otherwise render those agreements unenforceable. And the parties opposing arbitration in those three cases did not submit legally sufficient evidence that arbitration of their claims would be unconscionable. Therefore, the trial court erred by denying Olshan's pleas in abatement, and we conditionally grant mandamus relief in the Kilpatrick, Tisdale, and Tingdale

cases and remand those cases to the trial court for further proceedings consistent with this opinion. We are confident that the trial courts will comply, and the writs will issue only if they fail to do so.

Justice HECHT filed a concurring opinion, in which Justice MEDINA joined.

Justice HECHT, concurring, in which Justice MEDINA joined.

I join fully in the Court's opinion and write only with this further observation.

The homeowners contend that the contracts at issue violated the Texas Home Solicitation Act[1] because they did not contain the requisite notice of their right to cancellation and are therefore void by express provision of the Act.[2] In response, Olshan tells us in its briefing only that it "will present its defenses ... in the arbitral forum". Asked at oral argument what defenses it has to the homeowners' contention that their contracts, including the arbitration provisions, are void and unenforceable, counsel answered that "there might be an estoppel defense" because the homeowners did not challenge the validity of the contracts until work was completed. Counsel also argued that even if the contracts are void, the arbitration provision is severable and valid, and the homeowners

---

1. Act of May 18, 1973, 63rd Leg., R.S., ch. 246, § 1, 1973 Tex. Gen. Laws 574, codified as TEX.REV.CIV. STAT ANN. art. 5069–13.01, amended by Act of April 4, 1975, 64th Leg., R.S., ch. 59, § 1, 1975 Tex. Gen. Laws 124, and by Act of May 27, 1995, 74th Leg., R.S., ch. 926, § 1, 1995 Tex. Gen. Laws 4649, recodified by Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 3, 1997 Tex. Gen. Laws 3091, 3583, as TEX. BUS. & COM.CODE §§ 39.001–.009, and by Act of May 15, 2007, 80th Leg., R.S., ch. 885, § 2.01, 2007 Tex. Gen. Laws 1905, 2026, as TEX. BUS. & COM.CODE §§ 601.001–.205.

2. Section 601.201, TEX. BUS. & COM.CODE, provides that "[a] sale or contract entered into

under a consumer transaction in violation of ... Subchapter D is void." Section 601.152, in subchapter D, states: "A merchant may not: (1) at the time the consumer signs the contract pertaining to a consumer transaction or purchases the goods, services, or real property, fail to inform the consumer orally of the right to cancel the transaction; or (2) misrepresent in any manner the consumer's right to cancel." The prior versions of the Act contained substantively identical provisions. Former TEX. BUS. & COM.CODE. § 39.008(a)(3)-(4) & (b); TEX.REV.CIV. STAT. ANN. art. 5069–13.03(a)(3)-(4) & (b).

must still submit their complaints to arbitration. Olshan has cited no authority for either of these arguments.

The homeowners acknowledge that, as the Court notes, the validity of the contracts is a matter for the arbitrator to decide.[3] But the homeowners argue that the invalidity of the contracts is a foregone conclusion and that "the entire process ... will be a needless waste of time, energy, and money".[4] I agree with the Court that even if this is true, the contracts are not unconscionable. But being led on a wild goose chase,[5] if that is all arbitration comes to, is not without remedy.

If, as the homeowners predict, the arbitrator concludes that the contracts are indeed void, Olshan and its counsel are subject to being sanctioned by the trial court for filing a groundless motion to compel arbitration.[6] The trial court certainly has the authority to sanction frivolous resistance to arbitration, and sanctions are not a one-way ratchet. The court's authority to sanction a frivolous motion to compel is not displaced by the arbitrator's authority to determine the predicate issue—that the contracts are unenforceable. If the dispute returns to the trial court, the homeowners may seek full redress for Olshan's lark.

---

**3.** *Ante* at 898 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)).

**4.** *E.g.,* Brief of Real Parties in Interest Kenneth and Vickie Kilpatrick at 21.

**5.** *See* WILLIAM SHAKESPEARE, ROMEO AND JULIET act 2, sc. 4:

"Romeo: Switch and spurs, switch and spurs; or I'll cry a match.
"Mercutio: Nay, if thy wits run the wild-goose chase, I have done; for thou hast more of the wild-goose in one of thy wits than, I am sure, I have in my whole five."

**6.** TEX.R. CIV. P. 14; TEX. CIV. PRAC. & REM.CODE §§ 9.001–.014, 10.001–.006.